JILL C. DAVIS, ESQ.
Nevada Bar No.: 8418
MICHAEL R. JOE, ESQ.
Nevada Bar No.: 10626
**LEGAL AID CENTER OF**
**SOUTHERN NEVADA, INC.**
725 E. Charleston Blvd
Las Vegas, NV  89104
Telephone: (702) 386-1070 x 1452
Facsimile: (702) 388-1642
jdavis@lacsn.org

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MARIA TREJO DE ZAMORA and, ISELA GOMEZ-DEHINES<br><br>                          Plaintiff,<br><br>vs.<br><br>AUTO GALLERY, INC.<br><br>                          Defendant(s). | Case No.: 2:12-cv-01357-MMD-CWH |

## MOTION FOR SUMMARY JUDGMENT

Plaintiffs, MARIA TREJO DE ZAMORA and ISELA GOMEZ-DEHINES, by and through their counsel, JILL C. DAVIS, Esq. and Michael R. Joe, Esq. of the Legal Aid Center of Southern Nevada, Inc., for their Complaint against Defendant, AUTO GALLERY, INC., allege and state as follows:

## I. INTRODUCTION

1.      This Complaint arises out of the sale on credit of a 2004 Nissan Xterra,  (VIN 5N1ED28T44C66010) from Defendant, AUTO GALLERY, INC., to Plaintiffs,  MARIA TREJO DE ZAMORA and ISELA GOMEZ-DEHINES, on August 17, 2011.  During the course of the August 17, 2011 transaction and thereafter, Defendant violated numerous state and federal statutes, engaged in fraudulent misrepresentation and converted Plaintiffs' personal property.

## II. LEGAL STANDARDS

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant. *Crawford–El v. Britton,* 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,* 18 F.3d 1468, 1471–72 (9th Cir.1994). At bottom, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses. *Celotex Cop. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, the rule functions to " 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments). Procedurally, under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323; *Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir.2001) (en banc). If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Anderson.,* 477 U.S. at 248; *Auvil v. CBS "60 Minutes",* 67 F.3d 816, 819 (9th Cir.1995).

A clear focus on where the burden of proof lies as to the factual issue in question is crucial to summary judgment procedures. Depending on which party bears that burden, the party seeking summary judgment does not necessarily need to submit any evidence of its own. When the opposing party would have the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim. *See e.g., Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Rather, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue. *See Celotex,* 477 U .S. at 323–24 (1986). ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' "). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a circumstance, summary judgment must be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

To defeat summary judgment the opposing party must establish a genuine dispute as to a material issue of fact. This entails two requirements. First, the dispute must be over a fact(s) that is material, i.e., one that makes a difference in the outcome of the case. *Anderson,* 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Whether a factual dispute is material is determined by the substantive law applicable for the claim in question. *Id.* If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment. "[A] complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322.

Second, the dispute must be genuine. In determining whether a factual dispute is genuine the court must again focus on which party bears the burden of proof on the factual issue in question. Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual claim. Conclusory allegations, unsupported by evidence are insufficient to defeat the motion. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial. *Anderson,* 477 U.S. at 249; *Devereaux,* 263 F.3d at 1076. More significantly, to demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such that a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson,* 477 U.S. at 248, 252. Absent any such evidence there simply is no reason for trial.

The court does not determine witness credibility. It believes the opposing party's evidence, and draws inferences most favorable to that party. *See id.* at 249, 255; *Matsushita,* 475 U.S. at 587. Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which the inference may be reasonably drawn. *American Int'l Group, Inc. v. American Int'l Bank,* 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J., dissenting) (citing *Celotex,* 477 U.S. at 322). If reasonable minds could differ on material facts at issue, summary judgment is inappropriate. *See Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995). On the other hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (citation omitted); *Celotex.,* 477 U.S. at 323 (If the evidence presented and any reasonable inferences that might be drawn from it could not support a judgment in favor of the

opposing party, there is no genuine issue). Thus, Rule 56 serves to screen cases lacking any genuine dispute over an issue that is determinative of the outcome of the case.

### III.   UNCONTESTED MATERIAL FACTS

In compliance with Local Rule ("LR") 56-1, the following is submitted as a concise statement of facts material to the disposition of this Motion that Defendants claim are not genuinely at issue:

1.      On or about August 17, 2011, Plaintiffs,  MARIA TREJO DE ZAMORA  and ISELA GOMEZ-DEHINES (hereinafter, "Plaintiffs") became interested in purchasing a used vehicle on credit. (*See* Exhibit A Affidavits of Maria Trejo De Zamora and Isela Gomez-Dehines)

2.      On August 17, 2011, Plaintiffs traveled to Defendant, AUTO GALLERY, INC., (hereinafter,  "Defendant"),  used  car  lot  and  saw  a  2004  Nissan  Xterra,    (VIN 5N1ED28T44C66010)  (hereinafter, "the vehicle"). (*See id.*)

4.      The sales person did not speak Spanish, but Plaintiffs spoke to an assistant who spoke some Spanish, and were presented with a retail installment sales contract in English.  (*See id.*)

5.      Plaintiffs have limited ability to understand, speak or read English. (*See id.*)

6.      Plaintiffs asked for the contract in Spanish but were not provided a retail installment sales contract Spanish.  (*See id.*) (*See also* Exhibit B Retail Installment Sales Contract hereinafter ("RISC")).

7.      The retail installment sales contract lists the vehicle's sale price as $7,198.00, sales tax of $582.30 for a total of $7,771.30 and a finance charge of $3,000.00 for a total price of $10,771.30.  (*See id.*)

8.      The RISC states that there will be 15 monthly payments of $718.20 beginning on September 1, 2011.  (*See id.*)

9.      The RISC does not disclose the annual percentage rate, which is 52.662%.(*See id.*)

10.     Plaintiffs paid $3,500 in cash as a down payment but were not given a receipt as Defendant refused to issue a receipt as Defendant stated it was to reduce the sales tax.

11.     The Plaintiffs detrimentally relied upon Defendants' failure to disclose the annual percentage rate of 52.662%, as this exceeds the standard used car dealership interest of 29.95% for a client with very poor credit, and Plaintiffs would not have purchased the vehicle if the annual percentage rate had been disclosed on the face of the contract.  (*See id.*)

12.     The RISC was not offered in Spanish to the Spanish speaking Plaintiff.  (*See id.*)

13.     The RISC omits material information in that the contract is not in the form and content required by NRS 97.299 and NAC 97.110 but rather is a BBI Autoform contract. (*See* Exhibit B- RISC.)

14.     On September 9, 2011 Plaintiffs made and Defendants accepted a late payment of $1000.00 eight days late as evidenced by Receipt No. 163282, which indicates an outstanding balance of $9,771.30. (*See* Exhibit A affaidavits and Exhibit C – receipts)

15.     On October 17, 2012 Plaintiffs made and Defendants accepted a late payment of $1,000.00 seventeen days late as evidenced by Receipt No. 163292, which indicates the outstanding balance of $8,771.30. (*See id.*)

16.     On November 18, 2011 Plaintiffs made and Defendants accepted a late payment of $1,000.00 seventeen days late as evidenced by Receipt No. 163302, which indicates the outstanding balance of $7,771.30. (*See id.*)

17.     On January 18, 2012 Plaintiffs made and Defendants accepted a late payment of

$500.00 seventeen days late as evidenced by receipt No. 163316. (*See id.*)

18.     On February 15, 2012 Plaintiffs made and Defendants accepted a late payment of $4,200 fourteen days late as evidenced by receipt No. 163332, upon which this receipt reflects Auto Gallery's agreement to reduce the overall purchase price by $1,500.00, indicating a balance due of $1,571.30. (*See id.*)

19.     On April 4, 2012 Plaintiffs made and Defendants accepted a late payment of $500.00 four days late. (*See id.*)

20.     Plaintiffs attempted to pay $600 in May 2012 however the Auto Gallery refused the payment, and demanded Plaintiff sign a new contract stating she owed $2,500.00. (*See id.*)

21.     Plaintiffs refused to negotiate the terms of the initial contract and would not sign the new contract for $2,500.00. (*See id.*)

22.     The vehicle was wrongfully repossessed by Defendant on July 5, 2012. (*See id.*)

23.     Plaintiffs were not in default when the vehicle was repossessed on July 5, 2012. (*See id.*)

24.     By the terms of the August 17, 2011 contract, Plaintiffs were to have paid $7,898.88 with their July 2012 payment (718.08 x 11 months September through July). (*See id.* and Exhibit B RISC)

25.     By July 2012, Plaintiffs paid $8,200 for the vehicle with their April 4, 2012 payment ($1,000 + $1,000 + $1,000 + $500 + $4,200 + $500 = $8,200). (*See id.*)

26.     Plaintiffs were ahead with their payments, and not in default on July 5, 2012. (*See id.*)

27.     Defendant consistently accepted late payments. (*See id.* and Exhibit C – receipts)

# V. LEGAL ARGUMENT

## 1. Violations of the Truth in Lending Act (TILA)

Congress enacted TILA "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601. To effectuate TILA's purpose, a court must construe "the Act's provisions liberally in favor of the consumer" and require absolute compliance by creditors. *In re Ferrell,* 539 F.3d 1186, 1189 (9th Cir.2008); *see also Jackson v. Grant,* 890 F.2d 118, 120 (9th Cir.1989) ("Even technical or minor violations of the TILA impose liability on the creditor.").

The Defendants violated the Truth in Lending Act ("TILA") by failing to disclose the interest rate, and. amount financed in the Contract at issue. (Exhibit B  The transaction of August 17, 2011, was a consumer credit transaction within the meaning of TILA, 15 U.S.C. § 1602 and Regulation Z, 12 C.F.R. § 226.2, because:

    i.    Defendant offered to extend credit to Plaintiff, who is a "consumer," as that term is defined in 12 C.F.R. § 226.2(a)(11). 12 C.F.R. § 226.1(c)(1)(i);

    ii.    Defendant "regularly" extends credit to consumers, as that term is defined in 12 C.F.R. § 226.2(17)(v). 12 C.F.R. § 226.1(c)(1)(ii);

    iii.    The credit is subject to a "finance charge," as that term is defined in 12 C.F.R. § 226.4(a), or is payable by a written agreement in more than four installments. 12 C.F.R. § 226.1(c)(1)(iii); and

    iv.    The credit is primarily for personal, family, or household purposes. 12 C.F.R. § 226.1(c)(1)(iv).

Defendant, in the contract dated August 17, 2011, failed to disclose the APR in violation of TILA and Regulation Z. (See Exhibit B Contract). TILA and Regulation Z have been violated in the following respects:

i.   The loan agreement fails to disclose the APR of 52.662% and include a brief description, such as "the cost of your credit as a yearly rate," in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z, § 226.18(e);

ii.  The loan agreement fails to disclose the "amount financed," using that term, and a brief description such as "the amount of credit provided to you or on your behalf," in violation of 15 U.S.C. § 1638(a)(2) and Regulation Z, § 226.18(b).

iii. The loan agreement fails to disclose the "finance charge," using that term, and a brief description such as "the dollar amount the credit will cost you," in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z, § 226.18(d).

iv.  The loan agreement fails to make the terms "finance charge" and "annual percentage rate" more conspicuous than any other disclosure, in violation of 15 U.S.C. § 1632(a) and Regulation Z, § 226.17(a)(2);

v.   The loan agreement fails to provide a statement of the consumer's right to obtain, upon request, a written itemization of the amount financed, or fails to automatically disclose itemization of the amount financed, including amounts paid to other persons by the creditor on the consumer's behalf, with those persons identified, in violation of 15 U.S.C. § 1638(a)(2)(B) and Regulation Z, § 226.18(c); and

v.   The loan agreement fails to include a separate written itemization of the amount financed, including any amounts paid to other persons by the creditor on the consumer's behalf, specifically, public officials or government agencies, as required by Reg. Z, § 226.18(c)(1)(iii).

This is precisely the type of RISC that TILA was enacted to prevent dealers from using on unsophisticated consumers. The finance charge is in small print and does not state a percentage rate. Plaintiff both state they would not have purchased the vehicle at an exorbitant interest rate of 52.662%. (Exhibit A affidavits of Plaintiffs) The contract buries the finance charge information and with that fails to inform the consumers what interest rate they are being charges. TILA is about disclosure and this contract lacks disclosure. The legislative history from Congress's enactment and amendment of TILA is consistent with the language of the statute limiting its scope to disclosure. *See* S.Rep. No. 392, at 1 (1967) ("The basic purpose of the truth in lending bill is to provide a full disclosure of credit charges to the American consumer. The bill does not in any way regulate the credit industry...."); H.R.Rep. No. 1040 (1967), *as reprinted in*

1968 U.S.C.C.A.N. 1962, 1963 ("Title I, the truth in lending and credit advertising title, [does not] regulate[ ] the credit industry.... It provides for full disclosure of credit charges, rather than regulation of the terms and conditions under which credit may be extended."); S. Rep. 100-259, at 3 (1987), *as reprinted in* 1987 U.S.C.C.A.N. 3936, 3938 ("The Committee believes that early disclosure of relevant cost information, coupled with widespread publication of the costs of different cards, will help remedy the problem of enabling consumers to shop around for the best cards.").

Summary judgment must be granted to the Plaintiffs as the RISC clearly violates TILA. The RISC fails to state the exorbitant interest charged to the consumers in this matter, which is a clear violation of TILA.

**2. Defendants violated of NRS Chapter 97, Retail Installment Sales of Goods and Services**

Nevada has specific laws regarding what is a retail sales installment contract, and by statute specifically states what a RISC for a used car must contain.  In this case the contract is clearly a RISC contract.

NRS 97.115 defines a "retail installment transaction" as a:

> . . . transaction in which a retail buyer purchases goods . . . from a retail seller pursuant to a retail installment contract . . . which *may* provide for a finance charge and under which the buyer agrees to pay the total of payments in one or more installments.

(Emphasis added).

Because the August 17, 2011 Contract included a finance charge and was payable in one or more installments, the August 17, 2011 Contract was a "retail installment" transaction as defined in NRS 97.115.

Defendant is a seller as defined by statute.

NRS 97.125(1)(c) defines a "retail seller" or "seller" as:

A person, other than a financial institution, who regularly extends,

whether in connection with sales or leases of goods or services, credit which is payable by agreement in more than four installments . . .

Under the August 17, 2011 Contract, Plaintiff was required to pay Defendant fifteen (15) installments of $718.08. Therefore, Defendant is a retail seller, as defined in NRS 97.125(1)(c).

The provisions of NRS Chapter 97 are exclusive, and govern all retail installment transactions included in NRS Chapter 97. *See* NRS 97.285. Contracts for the sale of vehicles are included in NRS Chapter 97. *See* NRS 97.297 to 97.299, inclusive. The transaction of August 17, 2011, involved the taking of a security interest to secure part of the purchase price of the vehicle; an application for credit was made through Defendant as the seller of the vehicle; Defendant is a "dealer" as defined by NRS 482.020, and; the sale was not a commercial transaction.

Defendant violated NRS 97.299 by failing to use the form prescribed by the Commissioner of Financial Institutions (found in NAC 97.110) for contracts to be used in the sale of vehicles if the sale involves the taking of a security interest to secure all or part of the purchase price of the vehicle, the application for credit is made to or through the seller of the vehicle, the seller is a dealer, and the sale is not a commercial transaction. Specifically, Defendant violated NRS 97.185(1)(e) by failing to include the aggregate amount of official fees in the written contract. (*See* Exhibit B RISC) Defendant violated NRS 97.299(2)(d) by failing to include in the written contract a description of the method for calculating the unearned portion of the finance charge upon prepayment in full of the unpaid total of payments as prescribed in NRS 97.255. (*See id.*)

If the Defendant has used the contract prescribed by law in NRS Chapter 97, there would be no violations as the contract has a section for TILA disclosures, and the mandatory state disclosures. The form used in this case was from BPI Auto Forms. (Exhibit B- RISC) This is a

generic form contract that does not comply with federal TILA disclosures or Nevada requirements for disclosures.

Summary judgment must be granted as the Defendant has failed to use the required form prescribed by the state of Nevada.  As a result of these violations of Nevada law, Defendant is barred from the recovery of any finance charge, official fees, or any charge for delinquency or collection under or in connection with Plaintiff's written contract, pursuant to NRS 97.305.  As a result of the foregoing violations of NRS Chapter 97, all Plaintiff owed Defendant under the August 17, 2011 Contract is the selling price of the vehicle $7,189, plus sales tax of $582.30 (8.1% sales tax on $7,189.00), or $7,771.30, thus pursuant to NRS 97.305 Plaintiff is entitled to damages of $8,200 (total paid) - $7,771.30 = $428.70.

### 3.  Defendant violated NRS Chapter 97, Retail Installment Sales of Goods and Services and NRS 482.3277 Dealers: Certain purchasers and prospective purchasers to be allowed to view certain documents in Spanish language

Nevada has specific laws regarding what is a retail sales installment contract, and by statute specifically states what a RISC for a used car must contain.  In this case the contract is clearly a RISC contract.

NRS 97.115 defines a "retail installment transaction" as a:

> . . . transaction in which a retail buyer purchases goods . . . from a retail seller pursuant to a retail installment contract . . . which *may* provide for a finance charge and under which the buyer agrees to pay the total of payments in one or more installments.

(Emphasis added).

Because the August 17, 2011 Contract included a finance charge and was payable in one or more installments, the August 17, 2011 Contract was a "retail installment" transaction as defined in NRS 97.115.

Defendant is a seller as defined by statute.

NRS 97.125(1)(c) defines a "retail seller" or "seller" as:

A person, other than a financial institution, who regularly extends, whether in connection with sales or leases of goods or services, credit which is payable by agreement in more than four installments . . .

Under the August 17, 2011 Contract, Plaintiff was required to pay Defendant fifteen (15) installments of $718.08. Therefore, Defendant is a retail seller, as defined in NRS 97.125(1)(c).

The provisions of NRS Chapter 97 are exclusive, and govern all retail installment transactions included in NRS Chapter 97. *See* NRS 97.285. Contracts for the sale of vehicles are included in NRS Chapter 97. *See* NRS 97.297 to 97.299, inclusive. The transaction of August 17, 2011, involved the taking of a security interest to secure part of the purchase price of the vehicle; an application for credit was made through Defendant as the seller of the vehicle; Defendant is a "dealer" as defined by NRS 482.020, and; the sale was not a commercial transaction. Defendant violated NRS 482.3277 by failing to provide the retail installment sales contract in Spanish.

The sale was done in poor Spanish by the sales person's assistant as the Plaintiffs are Spanish speaking. (*See* Exhibit A- Affidavits of Plaintiffs)  The Plaintiffs asked for the retail installment sales contract in Spanish. (*See id.*) Defendants did not provide the retail installment sales contract in Spanish. (*See id.*) The Plaintiff were unable to read the contract they signed, and relied upon the representations made by the Defendant's employee. NRS 482.3277 was enacted to protect Spanish speaking consumers. Additionally, if the RISC was the one mandated by Nevada law the monetary amounts of the finance charge and percent would have been clear, even to a Spanish speaker.

Summary judgment must be granted for failure to provide the RISC in Spanish. As a result of the foregoing violations of NRS Chapter 97, all Plaintiff owed Defendant under the

August 17, 2011 Contract is the selling price of the vehicle $7,189, plus sales tax of $582.30 (8.1% sales tax on $7,189.00), or $7,771.30, thus pursuant to NRS 97.305 Plaintiff is entitled to damages of $8,200 (total paid) - $7,771.30 = $428.70.

### 3. Defendant Fraudulently Made a Material Misrepresentation

"[I]f a party's manifestation of assent to contract was induced by either a fraudulent or a material misrepresentation by the other party, upon which the recipient was justified in relying, the contract was voidable by the recipient." *See Robinson v. State Farm Mutual Auto. Ins. Co.,* 137 Idaho 173, 45 P.3d 829, 836 (2002). In order to succeed on a claim of fraudulent misrepresentation in Nevada, a plaintiff must show: (1) that the defendant made a false misrepresentation of material fact; (2) the defendant knew or believed the representation was false; (3) the defendant intended to induce the plaintiff to act or refrain from acting in reliance upon the misrepresentation; (4) the plaintiff justifiably relied on the misrepresentation; and (5) the plaintiffs were damaged by such reliance. *Albert H. Wohlers & Co. v. Bartgis,* 969 P.2d 949, 957–58 (Nev.1998). "With respect to the false representation element, the suppression or omission of a material fact which a party is bound in good faith to disclose is equivalent to a false representation, since it constitutes an indirect representation that such fact does not exist." *Nelson v. Heer,* 163 P.3d 420, 426 (Nev.2007) (internal quotation marks omitted). TILA requires, among other things, disclosure of finance charges and the annual percentage rate. *See* 15 U.S.C. § 1638(a); 12 C.F.R. § 226.18. The essential terms of a loan agreement are "the amount of the loan, the rate of interest, the terms of repayment, applicable loan fees and charges." *Kruse v. Bank of America,* 202 Cal.App.3d 38, 60, 248 Cal.Rptr. 217 (1988), *cert. denied,* 109 S.Ct. 87 (1989).

On August 17, 2011, Defendant made a false representation, through omission to Plaintiffs by failing to provide disclosures required under state and federal law as argued above.

Defendant is required by TILA to provide the Plaintiffs with the APR on the retail installment sales contract. Defendant as a dealer has the responsibility to provide TILA information, and specifically the APR of the retail installment sales contract. Defendant failed to disclose the true APR of 52.662% to the Plaintiffs. (*See* Exhibit B- Contract)   Defendant knew it was omitting the APR based upon the face of the contract, as no APR is listed. (*See id.*)

The interest rate on the car loan is material to the contract and an essential term of the contract. It is beyond dispute that defendant used a form contracts when it transacted with the Defendants, and that the form contract lacked the required disclosure. (*See Exhibit B- contract.*) As no material facts remain in dispute concerning defendant's use of form contracts that withheld relevant information from consumers and violated the TILA statute, the Court should find as a matter of law that defendant is liable to plaintiff for violation of TILA.

Defendant's misrepresentation of the APR on the August 17, 2011 Contract was designed to induce Plaintiffs to act and/or refrain from acting, specifically, Defendant intended to induce Plaintiffs to enter into the August, 2011 Contract and to refrain from leaving Defendant's used car lot and taking their business elsewhere. Plaintiffs are unsophisticated consumers who justifiably relied upon Defendant's false representation through lack of disclosures. (*See* Exhibit A Plaintiffs Affidavits) The Plaintiffs never would have purchased the vehicle if the true APR of 52.662% had been disclosed on the face of the contract, as is required by law. (*See* Exhibit A Plaintiffs Affidavits)   If the true APR of over 50% was disclosed the Plaintiffs would have realized that they were essentially overpaying for the vehicle. Without the disclosure the Plaintiffs were unaware of the true interest rate and the profit that the dealership was making on the RISC.

Plaintiffs sustained damages as a result of their reliance on Defendant's false representations through omission, specifically, but for Defendant's failure to disclose that the

APR on the August 17, 2011 Contract was 52.662%, Plaintiff would not have entered into the August 17, 2011 Contract if they were aware of the 52,662% APR. (*See id.*)   Additionally, the Plaintiffs have overpaid on the contract by paying such an exorbitant interest rate.

Summary judgment must be granted as to the material false representation.   To date, Plaintiff has suffered actual damages of no less than $8,200.00, which is the amount Plaintiffs have paid as a result of Defendant's fraudulent misrepresentation.   In the alternative, as a result of Defendant's fraudulent misrepresentation, Plaintiff is entitled to equitable rescission of the August 17, 2011 Contract through a declaration that the contract is void and an injunction mandating that Defendant return Plaintiffs as closely as possible to the position they was in prior to entering into the August 17, 2011 Contract.   Summary judgment should be granted material misrepresentation.

### 5. Defendant Violated NRS Chapter 598, Deceptive Trade Practices

NRS 598.0923(2) states that a person engages in a "deceptive trade practice" if, he "fails to disclose a material fact in connection with the sale or lease of goods or services."   On August 17, 2011, Defendant falsely represented that the APR on the August 17, 2011, by failing to disclose that the APR is 52.662% , thereby making a false representation through omission in violation of NRS 598.0915(15).NRS 598.0923(3) states that a person engages in a deceptive trade practice when he or she violates a state or federal statute or regulation relating to the sale or lease of goods or services. (*See* Exhibit B- Contract)   On July 22, 2011, as outlined above, Defendant violated the federal Truth in Lending Act, and NRS Chapter 97, thereby violating state and federal statutes and regulations relating to the sale of goods in violation of NRS 598.0923(3).

///

By violating NRS 598.0923(2) & (3), Defendant has engaged in "consumer fraud" as that term is defined by NRS 41.600(2)(e).  Pursuant to NRS 41.600(3)(a), Plaintiffs are entitled to recover actual damages of no less than $8,200, which is the total cost paid under the contract.

Summary judgment must be granted as the contract on its face clearly does not state the interest rate. (*See* Exhibit B- Contract)  By failing to disclose the interest rate, the deception was done.  And if the proper contract had been utilized, there would be no issue as it has delineated sections for the interest rate and other financial information to be stated. (*See* NAC 97)

### 6.    Defendants Converted the Personal Property of Plaintiffs

In order to show conversion, Plaintiffs must prove that Defendant "wrongfully exerted [dominion] over personal property in denial of, or inconsistent with, title or rights therein or in derogation, exclusion or defiance of such rights." *See Edwards v. Emperor's Garden Rest.,* 122 Nev. 317, 328, 130 P.3d 1280, 1287 (2006) (citing *Wantz v. Redfield,* 74 Nev. 196, 326 P.2d 413 (1958)).While conversion requires a physical act of dominion over personal property, liability for conversion is predicated upon "general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge." *Evans v. Dean Witter Reynolds, Inc.,* 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000).

On July 5, 2012 Plaintiffs were in full compliance with the terms of their August 17, 2011 contract, including current on their payments, in fact Plaintiffs were ahead on their contractual payment schedule on July 5, 2012. (Exhibit C)   Plaintiffs were to have paid $7,898.88 with their July 2012 payment (718.08 x 11 months September through July), however they had already paid $8,200 on the contract at that date.   Plaintiffs paid $8,200 in installment payments for the vehicle with their April 4, 2012 payment ($1,000 + $1,000 + $1,000 + $500 + $4,200 + $500 = $8,200).   Plaintiffs were ahead of their contractual payment schedule, and not

in default on July 5, 2012 when the vehicle was repossessed.  The repossession on July 5, 2012 was unlawful as the Plaintiffs were not behind in their payments but rather were ahead of their payment schedule.

On July 5, 2013, by repossessing Plaintiffs' vehicle Defendant committed a distinct act of dominion wrongfully exerted over Plaintiffs' personal property, i.e. 2004 Nissan Xterra,  (VIN 5N1ED28T44C66010), in denial of, or inconsistent with Plaintiffs' title or rights therein, and Defendants acts were in derogation, exclusion, or defiance of Plaintiffs' title or rights in the personal property. The repossession and conversion of the personal property is clear and unmistakable, and Plaintiffs are entitled to summary judgment on the matter.

**8.**    Defendants **Violated of NRS Chapter 104: Uniform Commercial Code**

NRS 104.1304 imposes the obligation of good faith in the performance of every contract or duty within Chapter 104. NRS 104.1201(t) provides that "good faith" means honesty-in-fact and the observance of reasonable commercial standards of fair dealing.  Defendant failed and refused to act honestly and to observe reasonable commercial standards of fair dealing, including, but not limited to: failing to adhere to TILA regulations, i.e. failing to state the APR as 52.662% and repossessing the vehicle when the Plaintiff was not in default.  NRS 104.9611(2) requires a secured party to send a debtor a notification before disposition of collateral.

Specifically, NRS 104.9614(1)(a) requires that notification to the debtor must contain the information required by NRS 104.9613(1), namely:

  i.    The method of intended disposition;

  ii.   Statement that the debtor is entitled to an accounting of the unpaid indebtedness and the charge, if any, for the accounting; and

  iii.  The time and place of a public disposition or the time after which any other disposition is to be made.

Defendant failed to provide Plaintiffs with a notification before disposition of collateral that contained the information required by NRS 104.9613(1). This did not occur in this matter. Furthermore, the law provides that the debtor has the right to redeem the collateral at any time before the sale is consummated. NRS 104.9623(3)(b). *See also* the safe harbor notice form contained in NRS 104.9614(3), stating: "You can get the property back at any time before we sell it . . . ."

Defendant never gave notice to Plaintiffs of the intended disposition pursuant to NRS 104.9623(3)(b) or NRS 104.9613. NRS 104.9610 requires that every aspect of disposition of collateral be commercially reasonable. Notice violations, or failure to provide notice, alone render a disposition commercially unreasonable. Based upon the clear violations of state law, the Plaintiffs are entitled to summary judgment.

### 9. Breach of Contract

Plaintiffs and Defendant entered into a valid and existing contract on August 17, 2011. (Exhibit B – contract) Defendant established a pattern and practice of accepting late payments from Plaintiffs without exercising its right to repossess under the Contract. Under Nevada law, ". . . a secured party who has not insisted upon strict compliance in the past, who has accepted late payments as a matter of course, [m]ust, before he may validly rely upon such a clause to declare default and effect repossession, [g]ive notice to the debtor (lessee) that strict compliance with the terms of the contract will be demanded henceforth if repossession is to be avoided." *Nevada National Bank v. Huff*, 94 Nev. 506, 512, 582 P.2d 364, 369 (1978) (*citing Ford Motor Credit Company v. Waters*, 273 So.2d 96 (Fla.App., 1973); *Fontaine v. Industrial National Bank of Rhode Island*, 111 R.I. 6, 298 A.2d 521, 11 U.C.C. Rptr. 1096 (1973); Kupka v. Morey, 541 P.2d 740 (Alaska, 1975); *and Varela v. Wells Fargo Bank*, 15 Cal. App. 741, 93 Cal. Rptr. 428 (Cal.App., 1971)).

There is a consistent pattern of accepting late payments. On November 18, 2011 Plaintiffs made and Defendants accepted a late payment of $1,000.00 seventeen days late as evidenced by Receipt No. 163302, which indicates the outstanding balance of $7,771.30. (*See id.*) On January 18, 2012 Plaintiffs made and Defendants accepted a late payment of $500.00 seventeen days late as evidenced by receipt No. 163316. (*See id.*) On February 15, 2012 Plaintiffs made and Defendants accepted a late payment of $4,200 fourteen days late as evidenced by receipt No. 163332, upon which this receipt reflects Auto Gallery's agreement to reduce the overall purchase price by $1,500.00, indicating a balance due of $1,571.30. (*See id.*) On April 4, 2012 Plaintiffs made and Defendants accepted a late payment of $500.00 four days late. (*See id.*) Clearly the patter of payments was consistently late.

The Defendant by continually accepting late payments clearly was not enforcing strict compliance with the contract. Defendant breached its contract with Plaintiff by, without first giving Plaintiff notice that henceforth strict compliance with the terms of the contract would be required, repossessing the vehicle. Plaintiffs are entitled to summary judgment under *Huff*, as the Defendant continually accepted late payments, even past thirty (30) days, and this acceptance of late payments was relied upon by the Plaintiffs. For the Defendant to repossess the vehicle after substantial payments had been made on the vehicle, after continually accepting late payments for almost a year violates *Huff,* and summary judgment should be granted for the Plaintiffs.

### IV.   **CONCLUSION**

Plaintiffs are entitled to summary judgment based upon the above arguments. The Plaintiffs are unsophisticated consumers who were taken advantage of by the Defendant. The Defendant clearly violated TILA, and misrepresented a material element of the contract, the interest rate. Additionally, the Defendant prematurely repossessed the vehicle as the Plaintiffs

were ahead on their contract payments and the dealership consistently accepted late payments under the contact.  Therefore, summary judgment should be granted for the Plaintiffs.

DATED this __29th__ day of March, 2013.

**LEGAL AID CENTER OF**
**SOUTHERN NEVADA, INC.**


  /s/ JILL C. DAVIS, ESQ.
JILL C. DAVIS, Esq.
Nevada Bar No. 8418
**LEGAL AID CENTER OF**
**SOUTHERN NEVADA, INC.**
725 E. Charleston Blvd
Las Vegas, NV  89104
Telephone: (702) 386-1070 x 1452
Facsimile:  (702) 388-1642
Attorneys for Plaintiffs

# EXHIBIT A

JILL C. DAVIS, ESQ.
Nevada Bar No.: 8418
MICHAEL R. JOE, ESQ.
Nevada Bar No.: 10626
**LEGAL AID CENTER OF**
**SOUTHERN NEVADA, INC.**
800 South Eighth Street
Las Vegas, Nevada 89101
Telephone: (702) 386-1070 x 176
Facsimile: (702) 388-1642
jdavis@lacsn.org

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

MARIA TREJO DE ZAMORA and,
ISELA GOMEZ-DEHINES

               Plaintiff,

vs.

AUTO GALLERY, INC.

               Defendant(s).

Case No.: 2:12-cv-01357-MMD-CWH

### AFFIDAVIT OF MARIA TREJO DE ZAMORA

**STATE OF NEVADA**     )
                         ) ss:
**COUNTY OF CLARK**     )

     I, MARIA TREJO DE ZAMORA**,** do hereby swear under penalty of perjury that the following assertions are true to the best of my knowledge and belief:

     1.     I am a Plaintiff in the above titled action:

     2.     On or about August 17, 2011, Plaintiffs, myself MARIA TREJO DE ZAMORA, and ISELA GOMEZ-DEHINES became interested in purchasing a used vehicle on credit.

     3.     On August 17, 2011, we traveled to Defendant, AUTO GALLERY, INC.,

(hereinafter, "Defendant"), used car lot and saw a 2004 Nissan Xterra, (VIN 5N1ED28T44C66010) (hereinafter, "the vehicle").

4.     The sales person did not speak Spanish, but I spoke to an assistant who spoke a little Spanish and was presented with a retail installment sales contract in English.

5.     I have limited ability to understand, speak or read English.

6.     I asked for the contract in Spanish but was not provided a retail installment sales contract in Spanish.

7.     A true and correct copy of the retail installment sales contract is attached to my affidavit and motion for summary judgment.

8.     The contract lists the vehicle's sale price as $7,198.00, sales tax of $582.30 for a total of $7,771.30 and a finance charge of $3,000.00 for a total price of $10,771.30.

9.     We paid $3500.00 in cash as a down payment. Auto Gallery refused to give us a receipt. They said they did this so that they would not have to pay more sales tax.

10. The contract states that there will be 15 monthly payments of $718.20 beginning on September 1, 2011.

11.     The contract does not disclose the annual percentage rate, which is 52.662%.

12.     I relied upon the contract, would not have purchased the vehicle if the annual percentage rate had been disclosed on the face of the contract.

13.     The contract was not offered in Spanish to the Spanish speaking Plaintiff.

14.     ISELA GOMEZ-DEHINES and I were both contributing to the payments for the vehicle.

15.     On September 9, 2011, we made and Defendants accepted a late payment of $1000.00 eight days late as evidenced by Receipt No. 163282, which indicates an outstanding balance of $9,771.30.

16.     On October 17, 2012 we made and Defendants accepted a late payment of $1,000.00 seventeen days late as evidenced by Receipt No. 163292, which indicates the outstanding balance of $8,771.30.

17.     On November 18, 2011 we made and Defendants accepted a late payment of $1,000.00 seventeen days late as evidenced by Receipt No. 163302, which indicates the outstanding balance of $7,771.30.

18.     On January 18, 2012 we made and Defendants accepted a late payment of $500.00 seventeen days late as evidenced by receipt No. 163316.

19.     On February 15, 2012 we made and Defendants accepted a late payment of $4,200 fourteen days late as evidenced by receipt No. 163332, upon which this receipt reflects Auto Gallery's agreement to reduce the overall purchase price by $1,500.00, indicating a balance due of $1,571.30.

20.     On April 4, 2012 we made and Auto Gallery accepted a late payment of $500.00 four days late.

21.     We attempted to pay $600.00 in May 2012, however Auto Gallery refused the payment, and demanded we sign a new contract stating we owed $2,500.00.

22.     We refused to negotiate the terms of the initial contract and would not sign the new contract for $2,500.00, and went to Legal Aid Center of Southern Nevada.

23.     The vehicle was wrongfully repossessed by Auto Gallery on July 5, 2012.

24.     We were not in default when the vehicle was repossessed on July 5, 2012.

25.     By the terms of the August 17, 2011 contract, we were to have paid $7,898.88 with our July 2012 payment (718.08 x 11 months September through July).

26.     By July 2012, we paid $8,200 for the vehicle with our April 4, 2012 payment ($1,000 + $1,000 + $1,000 + $500 + $4,200 + $500 = $8,200).

27. We were ahead with our payments, and not in default on July 5, 2012.

28. Auto Gallery consistently accepted late payments.

FURTHER YOUR AFFIANT SAYETH NAUGHT

DATED this _1st_ day of _February_, 2013.

_____
MARIA TREJO DE ZAMORA

SUBSCRIBED and SWORN to before me

this _1st_ day of _February_, 2013.

By: MARIA TREJO DE ZAMORA

NOTARY PUBLIC in and for said County and State

_____

A. ROSA NAJERA
NOTARY PUBLIC
STATE OF NEVADA
My Commission Expires: 04-13-15
Certificate No: 99-36092-1

1   JILL C. DAVIS, ESQ.
    Nevada Bar No.: 8418
2   MICHAEL R. JOE, ESQ.
    Nevada Bar No.: 10626
3   **LEGAL AID CENTER OF**
    **SOUTHERN NEVADA, INC.**
4   800 South Eighth Street
5   Las Vegas, Nevada 89101
    Telephone: (702) 386-1070 x 176
6   Facsimile: (702) 388-1642
    jdavis@lacsn.org
7

8                    **UNITED STATES DISTRICT COURT**

9                          **DISTRICT OF NEVADA**

10

11  MARIA TREJO DE ZAMORA and,          Case No.: 2:12-cv-01357-MMD-CWH
    ISELA GOMEZ-DEHINES
12

13                        Plaintiff,

14  vs.

15  AUTO GALLERY, INC.

16                        Defendant(s).

17

18

19              **AFFIDAVIT OF ISELA GOMEZ-DEHINES**

20

21  **STATE OF NEVADA**        )
                               ) ss:
22  **COUNTY OF CLARK**        )

23        I, ISELA GOMEZ-DEHINES, do hereby swear under penalty of perjury that the

24  following assertions are true to the best of my knowledge and belief:

25        1.      I am a Plaintiff in the above titled action:

26
27        2.      On or about August 17, 2011, Plaintiffs, myself, ISELA GOMEZ-DEHINES and

28  MARIA TREJO DE ZAMORA became interested in purchasing a used vehicle on credit.

                                        1

3.     On August 17, 2011, we traveled to Defendant, AUTO GALLERY, INC., (hereinafter, "Defendant"), used car lot and saw a 2004 Nissan Xterra, (VIN 5N1ED28T44C66010) (hereinafter, "the vehicle").

4.     The sales person did not speak Spanish, but I spoke to an assistant who spoke a little Spanish and was presented with a retail installment sales contract in English.

5.     I have limited ability to understand, speak or read English.

6.     I asked for the contract in Spanish but was not provided a retail installment sales contract in Spanish.

7.     A true and correct copy of the retail installment sales contract is attached to my affidavit and motion for summary judgment.

8.     The contract lists the vehicle's sale price as $7,198.00, sales tax of $582.30 for a total of $7,771.30 and a finance charge of $3,000.00 for a total price of $10,771.30.

9.     We paid $3500.00 in cash as a down payment.  Auto Gallery refused to give us a receipt.  They said they did this so that they would not have to pay more sales tax.

10. The contract states that there will be 15 monthly payments of $718.20 beginning on September 1, 2011.

11.     The contract does not disclose the annual percentage rate, which is 52.662%.

12.     I relied upon the contract, would not have purchased the vehicle if the annual percentage rate had been disclosed on the face of the contract.

13.     The contract was not offered in Spanish to the Spanish speaking Plaintiff.

14.     ISELA GOMEZ-DEHINES and I were both contributing to the payments for the vehicle.

2

15.     On September 9, 2011, we made and Defendants accepted a late payment of $1000.00 eight days late as evidenced by Receipt No. 163282, which indicates an outstanding balance of $9,771.30.

16.     On October 17, 2012 we made and Defendants accepted a late payment of $1,000.00 seventeen days late as evidenced by Receipt No. 163292, which indicates the outstanding balance of $8,771.30.

17.     On November 18, 2011 we made and Defendants accepted a late payment of $1,000.00 seventeen days late as evidenced by Receipt No. 163302, which indicates the outstanding balance of $7,771.30.

18.     On January 18, 2012 we made and Defendants accepted a late payment of $500.00 seventeen days late as evidenced by receipt No. 163316.

19.     On February 15, 2012 we made and Defendants accepted a late payment of $4,200 fourteen days late as evidenced by receipt No. 163332, upon which this receipt reflects Auto Gallery's agreement to reduce the overall purchase price by $1,500.00, indicating a balance due of $1,571.30.

20.     On April 4, 2012 we made and Auto Gallery accepted a late payment of $500.00 four days late.

21.     We attempted to pay $600.00 in May 2012, however Auto Gallery refused the payment, and demanded we sign a new contract stating we owed $2,500.00.

22.     We refused to negotiate the terms of the initial contract and would not sign the new contract for $2,500.00, and went to Legal Aid Center of Southern Nevada.

23.     The vehicle was wrongfully repossessed by Auto Gallery on July 5, 2012.

24.     We were not in default when the vehicle was repossessed on July 5, 2012.

25.   By the terms of the August 17, 2011 contract, we were to have paid $7,898.88 with our July 2012 payment (718.08 x 11 months September through July).

26.   By July 2012, we paid $8,200 for the vehicle with our April 4, 2012 payment ($1,000 + $1,000 + $1,000 + $500 + $4,200 + $500 = $8,200).

27.   We were ahead with our payments, and not in default on July 5, 2012.

28.   Auto Gallery consistently accepted late payments.

FURTHER YOUR AFFIANT SAYETH NAUGHT

DATED this _1st_ day of _February_, 2013.

_____
ISELA GOMEZ-DEHINES

SUBSCRIBED and SWORN to before me

this _1st_ day of _February_, 2013.

By: ISELA GOMEZ-DEHINES

NOTARY PUBLIC in and for said County and State

_____

A. ROSA NAJERA
NOTARY PUBLIC
STATE OF NEVADA
My Commission Expires: 04-13-15
Certificate No: 99-36092-1

4

# EXHIBIT B

Cell (702) 208090 8
622 1005 cell

**MOTOR VEHICLE PURCHASE ORDER AND FEDERAL DISCLOSURE STATEMENT**

Seller *Auto Gallery*
*6165 W. Sahara Ave #264*
*Las Vegas, NV 89146*

Stock No. _____
Source _____
Salesperson *Raymon*
Date *8/17/2011*
Bus. Phone *702 2220059*
Res. Phone *702 272 6673*

Purchaser *Mana Trejo-De-Zamora or Isela Gomez-Dehine*
Address *3890 Wynand Apt 410*        City *Las Vegas NV*        Zip *89103*

Enter in order for the automobile, accessories and insurance listed below under the terms and conditions set forth below on the reverse side.

NEW ☐  USED ☐  COLOR _____  TRIM _____        Approx. Del. Date _____        R.O.S No. _____

| Year | Cyl. | Make | Model | I.D. No. | License No. | MOTOR VEHICLE |
|------|------|------|-------|----------|-------------|---------------|
| 04 | 6 | NISSAN TERRA | | 5N1ED28T44C666040 | | $7184 00 |
| | | Odometer Reading 97639 | 4 SUV | Key No. | Tab. No. | |

## THIS CAR SOLD

# AS-IS

**UNLESS WRITTEN GUARANTEE IS GIVEN**

### AT TIME OF SALE

REMARKS *Car sold AS IS No Warranty*
*15 Payment of $718.00*
*15 x 718.00 = 10,771.50*
*first payment Due on sep/01*
*2011. late payment fee $100 each*
*time will add to the balance*

Legal Owner *Auto Gallery*

**INSURANCE REQUEST**
Purchaser requests the following insurance through Seller and understands that insurance will not be in force until accepted by the insurance carrier.

**WARNING-UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.**

S/S _____        BUYER        Gross Premium
$ _____ Ded. Comp. Fire & Theft _____ Mos.; $ _____
$ _____ Deductible Collision _____ Mos.; $ _____
Bodily Injury $ _____ Limits _____ Mos.; $ _____
Property Damage $ _____ Limits _____ Mos.; $ _____
Medical _____ _____ Mos.; $ _____
Disability Insurance _____ _____ Mos.; $ _____
Credit Life Insurance _____ _____ Mos.; $ _____
If Purchaser furnishes own insurance list: Total Gross Premium $ _____
INS. CO. _____
Agent/Broker _____
NOTICE: No person is required as a condition precedent to financing the purchase of a motor vehicle that any insurance be negotiated or purchased through a particular insurance agent or broker.

**CREDIT INSURANCE AUTHORIZATION**        Date _____
The undersigned voluntarily requests the following credit insurance for the term of the credit and understands that SUCH INSURANCE IS NOT REQUIRED AS A CONDITION TO THIS CREDIT EXTENSION.
☐ Credit Disability Insurance: Premium $ _____
☐ Credit Life Insurance Premium for one person $ _____
For additional insured agreed below $ _____
The undersigned acknowledges disclosure of the cost of such insurance as shown herein and authorizes inclusion of the premiums in the balance payable under this obligation.
Purchaser _____ Age _____
The undersigned requests credit life insurance as an additional insured:
Co-purchaser _____ Age _____

---

FILL OUT THIS SECTION IF USED CAR IS TO BE TRADED IN
YEAR _____ MAKE _____ MODEL _____
I.D. No. _____ Tab No. / License No. _____
ODOMETER READING _____ AV _____
BALANCE OWED TO _____
ADDRESS _____

| | | |
|---|---|---|
| ACCESSORIES | $ | |
| **MOTOR VEHICLE & ACCESSORIES** | $ | |
| SALES TAX | $ 582 | 30 |

| | CASH PRICE | |
|---|---|---|
| DOWNPAYMENT: Trade-In (A) $ | $ 7771 | 30 | 1 |
| Less Pay Off (B) $ | | |
| TRADE-IN (A less B) (C) $ | | |
| REC. # ___ Cash Downpayment Previously Paid (D) $ | | 2. |
| REC. # ___ Cash Downpayment Paid Herewith (E) $ | | |
| REC. # ___ Deferred Cash Downpayment (F) $ | | |
| CASH DOWNPAYMENT (D, E & F) (G) $ | | |
| TOTAL DOWNPAYMENT (Total of C & G) | $ -0- | 2 |
| UNPAID BALANCE ON CASH PRICE | $ 7771 | 30 | 3 |
| TOTAL GROSS INSURANCE PREMIUM | $ -0- | 4 |
| DEPARTMENT OF MOTOR VEHICLES | $ -0- | 5 |
| UNPAID BALANCE – AMOUNT FINANCED | $ 7771 | 30 | 6 |

License $ _____
Cert. of Title $ _____
Reg. $ _____
TOTAL $ _____

| | | |
|---|---|---|
| **ANNUAL PERCENTAGE RATE** _____ % | **FINANCE CHARGE** | $ 3000 | 00 | 7 |
| | **TOTAL OF PAYMENTS** (6+7+2F) | $ 10,771 | 30 | 8 |
| DEFERRED PAYMENT PRICE (Total of 1, 4, 5, & 7) $ | | 9 |
| TOTAL OF PAYMENTS _____ PAYABLE IN _____ INSTALLMENTS AS FOLLOWS: | | 10 |

*15 Payment's of $718.30*

Deferred Cash Downpayment due _____ 20 ___ of $ _____
and *15* Weekly/Monthly Payments of $ *718.30* each beginning *sep/01* 20 *11*

If any payment is more than twice the amount of a regular equal payment - IDENTIFY by writing "BALLOON PAYMENT". "BALLOON PAYMENTS" will not be refinanced.
SECURITY INTEREST: This Purchase Order is a security agreement covering the above described motor vehicle. Title to said property shall not pass to Purchaser until all sums payable, and other amounts due or to become due, are fully paid.
Upon execution of a Security Agreement pursuant to this Purchase Order said agreement shall provide:
PREPAYMENT: In the event of prepayment in full, Purchaser is entitled to a partial refund of the finance charge computed on the rule of 78. Where the finance charge, after computing the refund, amounts to less than $25.00, there may be retained an amount equal to $25.00. Any unpaid delinquency charges may be deducted from such refund. No refunds less than $1.00.
DEFAULT AND ACCELERATION: If Purchaser defaults in the performance of his obligations hereunder, Seller at his option may accelerate the payment of the unpaid balance, and (1) sue for such balance, or (2) repossess said property.
LATE CHARGES: A late charge of **5%** is payable on any payment past due 10 days.
Purchaser certifies that he is of legal age, and agrees to sign a Security Agreement according to the terms herein. In the event Payoff figures are more than quoted by Purchaser, Purchaser hereby agrees to pay this excess on demand. This order is subject to credit approval and is not binding unless signed by an authorized representative of Seller. All used cars or trucks sold "AS-IS" and without guarantee as to condition, year or model, unless otherwise specified in writing.

PROCEEDS OF LOAN – FROM _____
Amount of Loan _____
Total Amount _____ FINANCE CHARGE $ _____
of Loan _____ Payable in _____ Installments of $ _____
NOTICE TO BUYER ON OUTSIDE LOAN— Buyer may be required to pledge security for a loan, which security must be mutually agreed to by Buyer and Lender. Buyer will be obligated for the installment payments on BOTH THE CONDITIONAL SALES CONTRACT (SECURITY AGREEMENT) AND THE LOAN.
NOTICE TO BUYER: Do not sign this agreement before you read it or if it contains any blank spaces. You are entitled to a completed copy of this agreement. If you pay the amount due before the scheduled date of maturity of the indebtedness and you are not in default in the terms of the contract for more than 2 months, you are entitled to a refund of the unearned portion of the finance charge. If you fail to perform your obligations under this agreement, the vehicle may be repossessed and you may be liable for the unpaid indebtedness evidenced by this agreement.

**SEE OTHER SIDE FOR ADDITIONAL TERMS AND CONDITIONS:**

If you are buying a used vehicle with this contract, as indicated in the description of the vehicle above, federal regulation may require a special buyers guide to be displayed on the window. **THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.**

**Buyer acknowledges that: (1) before signing this agreement Buyer read both sides of this agreement and received a legible, completely filled-in copy of this agreement; and (2) Buyer has received a copy of every other document that Buyer signed during the contract negotiation.**

Buyer Sign Here X _____        Buyer Sign Here X _____

Seller *Auto Gallery* _____

ITEM 674  **BPI** · NATIONWIDE: (619) 286-7171 • (800) 339-9686  NO. CALIF.: (916) 334-3030 • (800) 296-3316  www.bpiautoforms.com

# EXHIBIT C

## RECEIPT

DATE AUG/15/2011    No. 163281

RECEIVED FROM Mouir    $ 300

three hund dollars    DOLLARS

○ FOR RENT
Ⓧ FOR 2002 Mitsubishi Lancer

| ACCOUNT | 1921 | 29 | Ⓧ CASH | FROM | | TO | |
|---|---|---|---|---|---|---|---|
| PAYMENT | 300 | 00 | ○ MONEY ORDER | | | | |
| BAL. DUE | 1621 | 29 | ○ CHECK | | | | |
| | | | ○ CREDIT CARD | BY | | | |

1182

## RECEIPT

DATE Sep/9/2011    No. 163282

RECEIVED FROM MARIA ZAMORA    $ 1000

one thousand dollars    DOLLARS

○ FOR RENT
Ⓧ FOR 2004 NISSAN XTERRA Paymnt

| ACCOUNT | 10771 | 30 | Ⓧ CASH | FROM | | TO | |
|---|---|---|---|---|---|---|---|
| PAYMENT | 1000 | 00 | ○ MONEY ORDER | | | | |
| BAL. DUE | 9771 | 30 | ○ CHECK | | | | |
| | | | ○ CREDIT CARD | BY | | | |

1182

## RECEIPT

DATE Sep/9/2011    No. 163283

RECEIVED FROM VALDEZ    $ 900

Nine hund dollars    DOLLARS

○ FOR RENT
Ⓧ FOR 2003 BMW 7651 Paymnt

| ACCOUNT | 2897 | 34 | Ⓧ CASH | FROM | | TO | |
|---|---|---|---|---|---|---|---|
| PAYMENT | 900 | 00 | ○ MONEY ORDER | | | | |
| BAL. DUE | 1997 | 34 | ○ CHECK | | | | |
| | | | ○ CREDIT CARD | BY | | | |

1182

AG 00007

## RECEIPT

DATE Sep/9/2011    No. 163284

RECEIVED FROM MICHAEL SHANE    $ 600

six hund dollars    DOLLARS

○ FOR RENT
Ⓧ FOR Paymnt of 02 C 320

| ACCOUNT | 2561 | 56 | Ⓧ CASH | FROM | | TO | |
|---|---|---|---|---|---|---|---|
| PAYMENT | 600 | 00 | ○ MONEY ORDER | | | | |

## RECEIPT

DATE 9/26/2011     No. 163289

RECEIVED FROM IVAN AGUSTIN    $ 1000⁰⁰

ONe thousand — DOLLARS

○ FOR RENT
◉ FOR Payment for oN DODGE RAM

| ACCOUNT | 3158 | 60 | ⊗ CASH | FROM | | TO |
|---|---|---|---|---|---|---|
| PAYMENT | 1000 | ⁰⁰ | ○ MONEY ORDER | | | |
| BAL. DUE | 2158 | 60 | ○ CHECK | | | |
| | | | ○ CREDIT CARD | BY Eugene | | |

---

## RECEIPT

(7022100745)

DATE 9/28/2011     No. 163290

RECEIVED FROM PIERCE NEAL HAMILTON    $ 500⁰⁰

five hundred dollars — DOLLARS

○ FOR RENT
◉ FOR 2001 chevy Monte carlo ss VIN# 2G1WK15KK1933725 0

| ACCOUNT | 6397 | 62 | ⊗ CASH | FROM DePosit NoN RefuNDBle |
|---|---|---|---|---|
| PAYMENT | 500 | ⁰⁰ | ○ MONEY ORDER | |
| BAL. DUE | 5897 | 62 | ○ CHECK | |
| | | | ○ CREDIT CARD | BY Eugene   Paid By 9/29/2011 Rest of the money |

---

## RECEIPT

DATE 10/3/2011     No. 163291

RECEIVED FROM NEAL HAMILton    $ 500⁰⁰

five hund dollars — DOLLARS

○ FOR RENT
◉ FOR Payment for 2001 chevy Monte carlo ss

| ACCOUNT | 2395 | 34 | ⊗ CASH | FROM | | TO |
|---|---|---|---|---|---|---|
| PAYMENT | 500 | ⁰⁰ | ○ MONEY ORDER | | | |
| BAL. DUE | 1895 | 34 | ○ CHECK | | | |
| | | | ○ CREDIT CARD | BY Eugene | | |

AG 00008

---

## RECEIPT

DATE Oct 17/2011     No. 163292

RECEIVED FROM MARIA TREJO    $ 1000⁰⁰

ONe thousand dollars — DOLLARS

○ FOR RENT
◉ FOR 2004 NISSAN XTERRA Payment

| ACCOUNT | 9771 | 38 | ⊗ CASH | FROM | | TO |
|---|---|---|---|---|---|---|
| PAYMENT | 1000 | ⁰⁰ | ○ MONEY ORDER | | | |
| BAL. DUE | 8771 | 30 | ○ CREDIT | BY Eugene | | |

**RECEIPT**

DATE 11/16/2011  No. 163301

RECEIVED FROM VALDES MUNOZ  $400⁰⁰

four hund t _____ DOLLARS

○ FOR RENT
Ⓧ FOR   Bmw 745i Paymnt

| ACCOUNT | 1997 | 34 | Ⓧ CASH |
| PAYMENT | 400 | ⁰⁰ | ○ MONEY ORDER |
| BAL. DUE | 1597 | 34 | ○ CHECK / ○ CREDIT CARD |

FROM _____ TO _____

BY _____

Ⓡ adams 1182

---

**RECEIPT**

DATE 11/18/2011  No. 163302

RECEIVED FROM MARIA  $1000⁰⁰

one thousend dolar _____ DOLLARS

○ FOR RENT
Ⓧ FOR   2004 NTerra

| ACCOUNT | 8771 | 30 | ○ CASH |
| PAYMENT | 1000 | ⁰⁰ | ○ MONEY ORDER |
| BAL. DUE | 7,771 | 30 | Ⓐ CHECK / ○ CREDIT CARD |

FROM _____ TO _____

BY _____

Ⓡ adams 1182

---

**RECEIPT**

DATE 11/18/2011  No. 163303

RECEIVED FROM MICHAEL SHANE LYNCH  $1100⁰⁰

One thousand onehundt _____ DOLLARS

○ FOR RENT
○ FOR   Paymnt

| ACCOUNT | 2261 | 56 | Ⓧ CASH |
| PAYMENT | 1100 | ⁰⁰ | ○ MONEY ORDER |
| BAL. DUE | 1161 | 56 | ○ CHECK / ○ CREDIT CARD |

FROM _____ TO _____

BY _____

Ⓡ adams 1182

---

AG 00009

**RECEIPT**

DATE 11/23/2011  No. 163304

RECEIVED FROM MOU NIR  $350⁰⁰

three hunl fifty dollars _____ DOLLARS

○ FOR RENT
Ⓧ FOR   1998 lexus

| ACCOUNT | 5290 | 11 | ○ CASH |
| PAYMENT | 350 | ⁰⁰ | ○ MONEY ORDER |
| BAL. DUE | | | ○ CHECK |

FROM _____ TO _____

RECEIPT

DATE 12/29/  No. 163313

RECEIVED FROM

$

Void

DOLLARS

○ FOR RENT
○ FOR

| ACCOUNT | | | ○ CASH |
| PAYMENT | | | ○ MONEY ORDER |
| BAL. DUE | | | ○ CHECK |
| | | | ○ CREDIT CARD |

FROM _____ TO _____

BY _____

Adams 1182

---

RECEIPT

DATE 12/31/2011  No. 163314

RECEIVED FROM MARCO A. BRICENO

$ 200

Two hundred dollars

DOLLARS

○ FOR RENT
○ FOR 2001 Mercedes Deposit

| ACCOUNT | | | ○ CASH |
| PAYMENT | 200 | 00 | ○ MONEY ORDER |
| BAL. DUE | | | ⊗ CHECK |
| | | | ○ CREDIT CARD |

Deposit NonRefundable

FROM _____ TO _____

BY _____

Adams 1182

---

RECEIPT

DATE Jan/4/2012  No. 163315

RECEIVED FROM JACQUARI CAVANAGH

$ 2500 00

Twenty five hundred

DOLLARS

○ FOR RENT
○ FOR Deposit for 02 CLK 430.

| ACCOUNT | 3500 | 00 | ⊗ CASH |
| PAYMENT | 2500 | 00 | ○ MONEY ORDER |
| BAL. DUE | 1000 | 00 | ○ CHECK |
| | | | ○ CREDIT CARD |

Deposit Non Refundable

FROM _____ TO _____

BY _____

Adams 1182

AG 00010

---

RECEIPT

DATE Jan/18/2012  No. 163316

RECEIVED FROM MARIA

$ 500 00

Five hundred

DOLLARS

○ FOR RENT
○ FOR Payment for Ch Xterra

| ACCOUNT | 7771 | 30 | ⊗ CASH | # 105 Due 01/18/2012 |
| PAYMENT | 500 | 00 | ○ MONEY ORDER |
| BAL. DUE | 7271 | | ⊗ CHECK |
| | | | ○ CREDIT |

No. 163329

## RECEIPT

DATE _____

RECEIVED FROM MARCO BRICENO

$661 38

Six hund sixty oNe dollars aud 38/100 ——— DOLLARS

○ FOR RENT
● FOR Payment FoR 2001 Mercedes Benz $430 °°

| ACCOUNT | 8733 | — | ○ CASH | FROM check # 119 | TO |
| PAYMENT | 661 | 38 | ○ MONEY ORDER | | |
| BAL. DUE | 8071 | 62 | ✗ CHECK | BY _____ | |
| | | | ○ CREDIT CARD | | |

Adams 1182

---

(702) Whoo 82 House
702 586 2 a57 - Cell

## RECEIPT

DATE Feb/16/2012

RECEIVED FROM HERRIOT CHIRESSEL

No. 163330

$500 —

Five hund dollars + ——— DOLLARS

○ FOR RENT
● FOR 2001 HoNda Passport DEPosit NoN ReFuNDBlC

| ACCOUNT | 7674 | 01 | ● CASH | FROM _____ | TO _____ |
| PAYMENT | 500 | 00 | ○ MONEY ORDER | | |
| BAL. DUE | 7174 | 0 | ○ CHECK | BY _____ | |
| | | | ○ CREDIT CARD | | |

Adams 1182

---

## RECEIPT

DATE 2/14/2012

RECEIVED FROM ERICK

No. 163331

$300 —

three hund dollars + ——— DOLLARS

○ FOR RENT
● FOR 2001 LiNcoN/s

| ACCOUNT | 4365 | 91 | ● CASH | FROM _____ | TO _____ |
| PAYMENT | 300 | 00 | ○ MONEY ORDER | | |
| BAL. DUE | 4065 | 91 | ○ CHECK | BY _____ | |
| | | | ○ CREDIT CARD | | |

Adams 1182

AG 00011

---

$1500 off New Balance is
4571 30 Next Payment 4572
DNC oN FEb/14/2012
By 300 payment LINcoN/ALER 1/14

## RECEIPT 2/15/2012

DATE 2/15/2012

RECEIVED FROM MARIA

No. 163332

$4200

Fourty two hund ——— DOLLARS

○ FOR RENT
● FOR 2004 NISSAN Xterra

| ACCOUNT | 7271 | 30 | ○ CASH | FROM _____ | TO _____ |
| PAYMENT | 4200 | 00 | ○ MONEY ORDER | | |
| BAL. DUE | 3071 | 30 | ✗ CHECK | BY _____ | |
| | | | ○ CREDIT CARD | | |

Adams 1182

**RECEIPT No. 163357**

DATE: 4/4/2012 04/2012
RECEIVED FROM: MARIA
Five hundred dollars
$500
FOR: Payment for 2004 NISSAN XTERRA
ACCOUNT: 1571 30
PAYMENT: 500 —
BAL. DUE: 1071 30
CASH: $500 Total ($400 cash $100 check#122)
Adams 1182

**RECEIPT No. 163358**

DATE: April/4/2012
RECEIVED FROM: MARCO
Six hund sidty one dollars and 38/100
$661 38
FOR: 01 Mercedes SH30
ACCOUNT: 7535
PAYMENT: 661 38
BAL. DUE: 6873 86
CHECK
Adams 1182

**RECEIPT No. 163359**

DATE: April/5/2012
RECEIVED FROM: ALFONZO
Five hund dollars
$500
FOR: 03 Mercedes $500 Down Payment
ACCOUNT: 1000
PAYMENT: 500
BAL. DUE: 500
CASH
Adams 1182

AG 00012

**RECEIPT No. 163360**

DATE: 4/13/2012
RECEIVED FROM: ALFONZO
Five hund dollars
$500
FOR: 03 Mercedes
ACCOUNT: 500
PAYMENT: 500
CASH